# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE

| | | |
|---|---|---|
| GEORGE D. MARRISETT | ) | |
| | ) | |
| V. | ) | NO. 2:14-CV-222 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for Supplemental Security Income under the Social Security Act was denied following an administrative hearing by an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that adverse determination. Both the plaintiff and the defendant have filed Motions for Summary Judgment [Docs. 13 and 15].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff, at the time of the filing of his application, was 51 years old, a person "approaching advanced age" under the applicable regulations. He was specifically found by the ALJ to have a limited education and the ability to communicate in English (Tr. 18). The ALJ found that the plaintiff was "functionally illiterate" (Tr. 13) due to difficulty reading and writing. The ALJ found that the plaintiff had past relevant work as a forklift operator, which requires medium exertion and is semi-skilled. He found that the plaintiff could no longer perform that past relevant work. Plaintiff was apparently employed as a forklift driver at Erwin Industries in 1997, when he earned $10,373.57, in 1998, when he earned $16,630.09, and in 1999, when he earned $719.16. Since 1999, the only income reported in the record was $1,806.36 in 2004. His highest other reported annual income of $4,946.25 was in 1996, apparently as an agricultural laborer. (Tr. 101-102).

Plaintiff's medical history is summarized in his brief as follows:

> At the request of the Disability Determination Service [hereinafter "DDS"] on January 4, 2011, Stephen Burge, M.D., reviewed Plaintiff's information and rendered an opinion concerning Plaintiff's physical conditions and resulting limitations (Tr. 171-181). This source opined to Plaintiff being capable of occasionally lifting fifty pounds, frequently lifting twenty-five pounds, standing and/or walking six hours out of an eight-hour workday, and sitting for six hours out of an eight-hour workday (Tr. 163). Plaintiff was further determined capable of occasionally climbing ladders, ropes and scaffolds and frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling

2

(Tr. 164). The ability to reach overhead was noted as frequent with the further recommendation that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation etc. (Tr. 165-166).

On September 12, 2011, Plaintiff reported to the Wellmont Hawkins County Hospital with complaints of neck pain (Tr. 171-181). Additional findings were noted as "used post hole digger yesterday" with the pain level reported as being a seven out of ten (Tr. 174). An x-ray was performed of the cervical spine (Tr. 180). In the history portion of the x-ray report, it stated "Neck and back pain" and "Please evaluate for abscess" (Tr. 180). The concluding result of this study was "No abnormalities seen" and "Abscess, if present would not be seen on these films" (Tr. 180). Plaintiff was given a prescription for Lortab (Tr. 175).

On September 26, 2011 Plaintiff was seen at the West Main Medical Center (Tr. 182-185). Complaints included vision and hearing problems and neck pain (Tr. 182). The neck pain was described as a constant moderate pain that has worsened (Tr. 182). Plaintiff reported the pain radiated to the head and bilateral interscapular (Tr. 182). The pain was further described as being sharp and dull at times (Tr. 182). Aggravating factors were reported as being turning of the head and movement. It was noted that Plaintiff had fallen off a horse approximately eight and one half years prior with worsening pain over the last one year (Tr. 182). Plaintiff also indicated hearing roaring sounds since the fall. On physical examination, Plaintiff's cervical spine was found to be tender with moderately reduced range of motion (Tr. 184). The assessment / plan was given as cervicalgia, tinnitus, disturbance of vision, and nondependent tobacco use disorder (Tr. 184). Plaintiff was offered a MRI or a CT scan and referral for optometrist or ophthalmology, but declined due to the lack of insurance (Tr. 184).

At the request of DDS, Plaintiff attended a consultative examination on October 24, 2011 with Robert A. Blaine, M.D. (Tr. 186-188). Allegations were given as neck pain, blurred vision, decreased hearing, and illiteracy (Tr. 186). On physical examination, decreased range of motion was found in the cervical spine, thoracolumbar spine, shoulders, and hips (Tr. 187). On the neurological portion of the physical examination, straight leg raises were noted as producing pain at 20 degrees bilaterally with deep tendon reflexes being unable to elicit in the upper extremities (Tr. 188). The diagnoses were given as posttraumatic neck pain, blurred vision, decreased hearing with tinnitus, and illiteracy (Tr. 188). Dr. Blaine's concluding assessment indicated the opinion Plaintiff could stand or walk for three to four hours in an eight-hour day, could lift and carry 10 pounds frequently and thirty pounds occasionally, and could sit for eight hours in an eight-hour day (Tr. 188).

On November 9, 2011, again at the request of DDS, Plaintiff was seen at Lakeway Regional Hospital for an imaging study of the chest and a pulmonary function test (Tr. 189-198). The impression from the imaging study was given as "Chronic increased interstitial markings are seen in each lung" (Tr. 189). The reviewing provider also indicated more focal areas of increased density was seen in the right infrahilar region, with noted uncertainty of whether this was chronic infiltrate/scarring or superimposed acute airspaces disease (Tr. 189). On the pulmonary function test, the administrator noted Plaintiff was cooperative but felt he did not give maximum effort (Tr. 190). The pre-bronchodilation results were FVCs of 2.55, 2.62, and 2.91 with the FEV-1 scores of 1.79, 1.85, and 1.91 (Tr. 190). The post-bronchodilation results were

3

FVCs of 3.19, 3.62, and 3.72 with FEV-1 scores of 2.60, 2.69, and 2.98 (Tr. 190).

Plaintiff was also evaluated at the Johnson City Eye Clinic at the request of DDS (Tr. 199-202). Following this examination, the impression / plan included trace nuclear sclerosis and mild blepharitis (Tr. 200). The examiner gave Plaintiff a new prescription for glasses and advised to wash both eyes in the morning and night with Sterilids (Tr. 200).

DDS requested and Plaintiff attended a psychological consultative examination on March 8, 2012 (Tr. 203-207). The evaluation procedures performed included a Clinical Interview with Mental Status Exam, the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV), and the Wide Range Achievement Test - Fourth Edition (WRAT4). The examiner obtained Plaintiff's personal, family, academic, vocational, medical, and mental health history (Tr. 203-204). On the Mental Status Examination, Plaintiff was noted to be limited in concentration and short term memory (Tr. 204). It was further noted Plaintiff was not seen as exaggerating symptoms for the purpose of gaining disability benefits (Tr. 204). Plaintiff was also noted to have put forth consistently good effort on the psychological testing (WAIS-IV and WRAT4) (Tr. 204). On the WAIS-IV Plaintiff obtained a full scale IQ of 65, a verbal comprehension score of 66, a perceptual reasoning score of 77, a working memory score of 77, and processing speed score of 62 (Tr. 204). On the WRAT4, Plaintiff was found to be at the 3.8 grade level in word reading, 5.7 grade level in sentence completion, at the 3.1 grade level in spelling, and at the 3.2 grade level in reading composite (Tr. 205). The examiner opined to Plaintiff not meeting the criteria for mild mental retardation, despite the full scale IQ score, because it was felt he did not have significant deficiencies in adaptive functioning, was able to hold jobs for years, could live independently, could drive, and was able to cook (Tr. 205). The examiner concluded the report with the assessment of ability to perform work-related activities (Tr. 206). In this section, the examiner stated "His gross-motor skills may be impaired by physical condition" (Tr. 206). The examiner opined to Plaintiff being capable of comprehending and following only simple job instructions with a markedly limited ability to understand written material or perform mathematical calculations (Tr. 206). The examiner further stated "His physical problems may detract from his ability to maintain attendance and meet an employment schedule" (Tr. 206).

On March 15, 2012, M. Duncan Currey, Ph.D, reviewed Plaintiff's information and records and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment (Tr. 208-223). This reviewing source indicates Plaintiff's condition was evaluated under 12.02 (organic mental disorders) (Tr. 208). The degree of limitation noted in the Psychiatric Review Technique form included moderate limitations in maintaining concentration, persistence, or pace (Tr. 218). On the Mental Residual Functional Capacity Assessment form, Plaintiff was opined as being capable of understanding, remembering, and carrying out simple instructions (Tr. 223). Plaintiff was further opined as being able to maintain attention and concentration for simple tasks with appropriate breaks (Tr. 223). This source concluded this form by indicating Plaintiff could relate appropriately to the public, peers, and supervisors and could adapt to changes and set goals (Tr. 223).

On March 19, 2012, James Gregory, M.D., reviewed Plaintiff's information and completed a Physical Residual Functional Capacity Assessment (Tr. 224-232). This reviewing source opined to Plaintiff retaining the capacity to occasionally lift and/or

carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in and eight-hour workday (Tr. 225). This source further opined to Plaintiff being limited to frequent overhead reaching with both arms (Tr. 227). It was further opined that Plaintiff's symptoms were generally not credible due to the severity of neck pain not correlating well with the objective findings, lack of effort on the pulmonary function testing, and a preference to try pain medications instead of diagnostic procedure further erodes credibility (Tr. 229).

Plaintiff returned to the West Main Medical Center on July 17, 2012 (Tr. 234-236). Plaintiff reported the pain medication hurting his stomach and having a knot on his neck (Tr. 234). Pain was also continued to be reported in his neck (Tr. 234). On physical examination tenderness in the neck area was noted along with a small firm mass on C7/C8 area (Tr. 236). The assessment was given as cervicalgia and abdominal pain (Tr. 236). Medications were noted as Cymbalta and Flexeril (Tr. 236).

[Doc. 14, pgs. 2-7].

At the administrative hearing, the ALJ took the testimony of Dr. Robert Spangler, a Vocational Expert ["VE"]. He asked Dr. Spangler to identify if plaintiff had, within the past 15 years, had any past relevant work which would constitute substantial gainful activity under the regulations. Dr. Spangler identified the job of forklift operator and classified the job as requiring medium exertion, being semiskilled, and having no transferable skills. Dr. Spangler was then asked to assume a person closely approaching advanced age of plaintiff's age, education, and past relevant work experience, who was functionally illiterate. He then asked Dr. Spangler to assume the person could perform light exertion, with "reaching limited to – overhead reaching limited to frequent or above shoulder reaching; able to understand, remember, and carry out simple instructions only; limited in a manner that I recognize that the claimant would be able to – unable to perform his past relevant work." When asked if there were jobs, Dr. Spangler stated "at light, simple, functionally illiterate, if the person could do the full range, which he could not, there's 129,460 give or take in the United States ... There's 2,741 in the State of Tennessee, less about ten percent for limitations so ninety

percent of the residual left-over that was added." Examples were food preparation, cafeteria line worker, food service from concession stands, dining room helper, dishwasher, light janitor, non-farm animal care and personal care worker. (Tr. 43-44). When asked if there would be jobs if the person was limited to standing and walking to four hours total in an eight-hour workday, Dr. Spangler stated the aforementioned total numbers would be reduced by one half rather than ten percent. (Tr. 44).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of cervicalgia and borderline intellectual functioning. (Tr. 12). He found that the plaintiff had the residual functional capacity ["RFC"] to perform light work which would involve frequent overhead reaching, while being functionally illiterate and able to only understand, remember and carry out simple instructions. (Tr. 13).

The ALJ then stated that the plaintiff alleged "that his neck pain, blurry vision, hearing problems and illiteracy are of the nature, intensity, frequency, and persistence to be disabling." (Tr. 14). The ALJ then evaluated the medical evidence to show why he ultimately found that none of these were severe impairments.[1]

Regarding the neck pain, he noted that the plaintiff had an x-ray of his cervical spine which showed no acute abnormalities, although physical examination had shown that he had a moderately reduced range of motion there. He noted that the plaintiff "turned down an offer to get an MRI or CT scan of his neck and wanted to try medication instead. (Tr. 14).

The ALJ then turned to the consultative exam conducted by Dr. Blaine on October 24,

---

[1]The Court is somewhat confused because cervicalgia *is* neck pain, to the best of the Court's understanding, and the ALJ already found that the cervicalgia was a severe impairment.

2011.  He noted that Dr. Blaine had opined after the exam that plaintiff could lift and carry 10 pounds frequently and 30 pounds infrequently and sit for 8 hours, but could only stand or walk for 3 to 4 hours in an 8 hour workday.  He gave Dr. Blaine's opinion "little weight as it is inconsistent with the medical evidence of record, based upon a one-time examination and relied too heavily upon claimant's subjective complaints of pain." (Tr. 15).

After noting examinations of the plaintiff's lungs and eyes, which are not at issue in this action, the ALJ discussed the psychological examination performed on March 8, 2012. He stated that plaintiff scored a full scale IQ of 65, and had a GAF of 65, which reflected "mild symptoms."  He noted plaintiff was considered capable of managing his own funds. The psychologist opined that he had moderate limitations in his ability to understand and remember genral items and concepts, "thus it was reasonable to expect he should be able to comprehend and follow on ly simple job instructions.  His ability to read and understand written material appeared markedly limited.  He had mild limitations in concentration and persistence and a satisfactory ability to interact with others.  He did not appear to limited in his ability to adapt to changes in the workplace or to be aware of normal hazards.  Plaintiff told the examiner that he sweeps, washes dishes, does laundry, takes out the trash and The performed some cooking.  The ALJ gave the examiner's opinions great weight. (Tr. 15-16).

The ALJ gave Dr. Burge, a state agency physician who did a report on plaintiff on January 4, 2011, little weight.  He gave the opinion of Dr. Gregory, another state agency physician great weight because "it is consistent with the medical evidence of record and the above residual functional capacity."  Likewise, he gave great weight to the opinion of Dr. Currey, a non-examining state agency psychologist, great weight for the same reason.  (Tr.

7

16 and 17).

He then stated that the plaintiff had "not received the type of medical treatment one would expect for a totally disabled individual," and that plaintiff had "relatively infrequent trips to the doctor for the allegedly disabling symptoms." The ALJ stated plaintiff's treatment has been essentially routine and conservative in nature. He noted that while plaintiff's activities of daily living he testified to at the hearing were extremely limited, but said they were inconsistent with the medical evidence and with previous reports of such activities, such as the one given the psychological examiner. Accordingly he found that the plaintiff was not credible to the extent his reported limitations were inconsistent with the ALJ's RFC finding. (Tr. 17).

The ALJ determined that the plaintiff cannot return to his past relevant work with the RFC he has now. He found that the plaintiff was closely approaching advanced age, and had a limited education with the ability to communicate in English. He noted that if the plaintiff could perform the full range of light work, he would be disabled under Rule 202.11 of the Grid. Since he could not perform the full range of light work, the ALJ was required to determine if there were other jobs the plaintiff could perform. Based upon the testimony of the VE, he found that the plaintiff could perform "approximately 2,466 regional and 129,460 nation" jobs. Accordingly he found that he was not disabled. (Tr. 18).

Plaintiff first argues that the ALJ erred in not finding plaintiff to have been disabled under guidelines 202.00(d) and 202.09 of the Medical-Vocational guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2, the "Grid." He states that Section 202.00(c) and (d) directs a finding of disability. The Grid is an intricate system of rules which definitively

state whether a person is or is not disabled if they are capable of performing the full range of work at each exertional classification according to the person's age, education, and previous work experience. Rules 201.01 through 201.22 deal with work at the light level. Section 202.00 (a),(b),(c),(d), (e),(f) and (g) basically help to explain the rationale behind the findings directed by the individual rules. They also provide some interpretive considerations to be utilized by the person deciding whether a person meets the requirements of a particular rule. For example, Rule 202.03 in a footnote refers to Section 202.00(f) to interpret whether the transferrable skills used in a person's previous work experience requires a significant degree of "vocational adjustment." If it does not, then Rule 202.03 directs a finding of not disabled for a person of advanced age. Likewise, Rule 202.07 refers in a footnote to Section 202.00(c), requiring a similar consideration even if the person of advanced age has an education of high school or more to determine if the skills are "readily transferrable."

Section 202.00(c) and (d) read as follows:

> (c) However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education.

> (d) Where the same factors in paragraph (c) of this section regarding education and work experience are present, but where age, though not advanced, is a factor which significantly limits vocational adaptability (i.e., closely approaching advanced age, 50-54) and an individual's vocational scope is further significantly limited by illiteracy or inability to communicate in English, a finding of disabled is warranted.

Plaintiff argues that under 202.00(d), based on its incorporation of parts of (c), "a

9

finding of disabled is warranted if: (1) the individual is closely approaching advanced age, (2) is limited to light work, (3) is unable to perform past work, (4) has no skills that are readily transferable to a significant range of semi-skilled or skilled work within the individuals functional capacity, and (5) is functionally illiterate. Plaintiff's assignment of error is that the ALJ failed to address the area of transferability of skills in the hearing decision. The Commissioner does not mention the transferability of skills question, but takes issue with the interpretation by the plaintiff of the ALJ's finding of functional illiteracy, stating that the ALJ found the plaintiff functionally illiterate for purposes of the RFC, but found the plaintiff had a limited education for the purpose of determining at Step Five whether the plaintiff was disabled under the Grid.

It is true that the ALJ found the plaintiff functionally illiterate in his RFC finding. However, in determining the plaintiff's vocational status, he found him to possess a limited education. Plaintiff has difficulty reading to the point that ability is virtually non-existent, but he is certainly capable of communicating in spoken English and in understanding it. He completed school through the 7th Grade. This is much more in keeping with a limited educational background than being a "classic" illiterate individual who not only cannot read but cannot deal with even simple concepts once a process is explained or a question asked.

In fact, there are specific grid rules which apply to these exact situations. The ALJ found that if the plaintiff could perform the full range of light work, he would be "not disabled" under Rule 201.11. That rule says that if a person is closely approaching advanced age, has a limited or less education, and has past skilled or semi-skilled work without transferrable skills, the person is not disabled.

The Court finds that this rule more closely matches the plaintiff's characteristics than does Rule 202.09 as urged by the plaintiff. Also, the ALJ and VE specifically found that the plaintiff had no transferrable skills, but both stated that the plaintiff's past relevant work as a forklift operator was semi-skilled. Using 202.11 as a framework for decision, the fact that one was able to perform semiskilled work is the key factor, not whether the skills are transferable. The Court does not feel that Section 202.00(d) requires a different result where the rules are specific. The forklift job, although near the limit of the 15 year range for considering it past relevant work, was nonetheless a job the plaintiff held for considerable time in 1997 and 1998. It was substantial gainful activity and it was semiskilled.

Plaintiff next argues that the ALJ erred in his finding that the plaintiff was not completely credible. He says the ALJ improperly relied upon his conservative treatment and failure to pursue better diagnostic tests such as an MRI or a CT scan because plaintiff simply could not afford the expense of such tests. The ALJ also gave great weight to state agency physician Dr. Gregory who also cited plaintiff's failing to get further testing as a factor militating against finding the plaintiff's subjective complaints to be credible. Plaintiff asserts that plaintiff's "financial ability to afford treatment is clear from the overall record." The plaintiff cites a district court case, *Holt v. Colvin*, 2013 WL 4040056 (M.D.Tenn., 2013) which held that an ALJ must consider an explanation of inability to afford treatment when basing a credibility determination on a plaintiff's inability to pursue medical treatment.

As noted by the Commissioner, the ALJ was aware of the plaintiff's financial situation regarding funds for medical treatment. It would have been appropriate for the ALJ to note this and to have pointed out that treatment is available to indigent persons by various means.

However, this is not the sole basis upon which the ALJ based his credibility determination. He noted the infrequency with which he saw his doctor, or any doctor, for his maladies. This is a different issue from not seeking expensive diagnostic testing. He also noted the discrepancy in his activities of daily living between the testimony at the hearing, such as the function report filed with his application, which included a statement that he does "hoof care" of a horse, even though he needs help with getting the hay. (Tr. 123). Even with the exertional capabilities opined by Dr. Blaine, which the ALJ rejected as too restrictive, plaintiff could have easily done more than what he testified to at the hearing. The issue is whether the finder of fact had substantial evidence to support his finding on credibility and whether he adequately explained his reasons. The Court finds that he did.

The final issue deals with whether the ALJ erred in not finding that the plaintiff met Listing 12.05 in 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. Listing 12.05C reads as follows:

> 12.05C *Intellectual disability*: intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, OR D are satisfied.
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Plaintiff argues that he meets all of the requirements of this listing. He points out the ALJ did not mention Listing 12.05C anywhere in his hearing decision. He argues that the listing differentiates between deficits in adaptive functioning, only requiring them to exist, and deficits in general intellectual functioning, requiring them to be "significant." He asserts

this is crucial because the consultative examiner, Ms. Palmer, only said that the plaintiff had no significant deficits in adaptive functioning. He also takes issue with the consultative examiner's factors considered in determining the extent of plaintiff's deficit in adaptive functioning, such as his having been employed and cooking. He also cites a district court case, *Miller v. Commissioner of Social Security*, 181 F. Supp. 2d 816 (S.D. Ohio 2001), which held, following other circuits because the Sixth Circuit had not taken a position, that "an ALJ must explain in detail why a Social Security claimant is, or is not, disabled under the Listings." *Id.*, at 819. That decision also stated that "in the absence of such a discussion, the Court cannot conduct a meaningful review of the record, for it is unclear precisely why, in the ALJ's view, plaintiff did not satisfy" the listing at issue in that case. *Id.*, at 820.

It is true that a step by step analysis by and ALJ as to whether a plaintiff meets all of the requirements of a particular listing would be helpful to the Court in reviewing the evidence the ALJ relied upon, the Court does not believe such an omission requires a remand if the evidence in the record supports the ALJ's conclusion. *See, Staggs v. Astrue*, 2011 WL 3444014, at page 3 (M.D. Tenn., 2011).

In order to be disabled as a matter of law under this listing, the plaintiff must meet the requirements of both the introductory paragraph of having "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested in the developmental period," *and* meet the IQ and additional impairment requirement spelled out in C.

Here, the ALJ had before him two specific pieces of evidence from mental health professionals indicating that the plaintiff did not meet Listing 12.05C. Ms. Palmer, the

13

consultative examiner who examined plaintiff and performed the testing, stated that plaintiff "has held several jobs for years and he has lived independently throughout his adulthood. He is able to drive and cook. He does not appear to have significant deficiencies in adaptive functioning. *It does not appear that he meets the criteria for mental retardation (intellectual disability).* [Emphasis added]. Also, Dr. Currey, the state agency psychologist, found only that the plaintiff had problems in the area of 12.02, organic mental disorders, but met no listing under that section or any other section. (Tr. 208). Specifically, in reference to 12.05, He stated that plaintiff had a full scale IQ of 65 "but higher function" with "no long data of MR" (longitudinal data of mental retardation). Plaintiff asserts that all of these assumptions were wrong and that his testimony about his past jobs and sufficiency to live independently negates any of this other information because they were based upon flawed assumptions. Nonetheless, these factors were carefully considered by Ms. Palmer and Dr. Currey, and were noted by the ALJ in his decision. Both diagnosed no worse than borderline intellectual functioning. Thus, there was substantial evidence that the plaintiff did not have "significantly subaverage general intellectual functioning." The opinions of these professionals can support a finding of the Commissioner that a plaintiff does not meet a listing. *See, Walker v Barnhart*, 72 F. App'x 355, 357 (6th Cir. 2003).

There was substantial evidence to support the findings of the ALJ, and to negate the plaintiff's argument that he meets Listing 12.05C. The findings regarding credibility and RFC are likewise supported. The ALJ did not improperly analyze plaintiff's vocational factors under the Grid. The VE identified a significant number of jobs. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 13] be

DENIED, and the Commissioner's Motion for Summary Judgment [Doc. 15] be GRANTED.[2]

                      Respectfully submitted,


                              s/ Dennis H. Inman
                             United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).